IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| HEIDI L. DAVIS, | ) | CASE NO. 5:14 CV 1929 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | WILLIAM H. BAUGHMAN, JR. |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | **MEMORANDUM OPINION AND** |
| | ) | **ORDER** |
| Defendant. | ) | |

# Introduction

**A.     Nature of the case and proceedings**

Before me[1] is an action by Heidi L. Davis under 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner of Social Security denying her application for supplemental security income.[2] The Commissioner has answered[3] and filed the transcript of the administrative record.[4] Under my initial[5] and procedural[6] orders, the parties have briefed

---

[1] ECF # 14. The parties have consented to my exercise of jurisdiction.

[2] ECF # 1.

[3] ECF # 9.

[4] ECF #s 10, 11.

[5] ECF # 6.

[6] ECF # 13.

their positions[7] and filed supplemental charts[8] and the fact sheet.[9] After review of the briefs, the issues presented, and the record, it was determined that this case can be decided without oral argument.

**B.     Background facts and decision of the Administrative Law Judge ("ALJ")**

Davis, who was 38 years old at the time of the administrative hearing,[10] has a high school education, but no prior relevant work experience.[11]

The ALJ, whose decision became the final decision of the Commissioner, found that Davis had the following severe impairments: degenerative disc and joint disease of the lumbosacral spine; bronchitis; mood disorder (characterized as depression, bipolar disorder, adjustment disorder with depressed mood and dysthymic disorder); generalized anxiety disorder; and personality disorder with borderline and histrionic traits.[12]

---

[7] ECF # 20 (Davis's brief); ECF # 23 (Commissioner's brief); ECF # 24 (Davis's reply brief).

[8] ECF # 20-1 (Davis's charts); ECF # 23-1 (Commissioner's charts).

[9] ECF # 19 (Davis's fact sheet).

[10] Transcript ("Tr.") at 27, 181.

[11] *Id*. at 27.

[12] *Id*. at 12.

After concluding that the relevant impairments did not meet or equal a listing,[13] and upon enlisting the help of a medical expert to "clarify the record,"[14] the ALJ made the following finding regarding Davis's residual functional capacity ("RFC"):

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except she can never climb ladders, ropes or scaffolds. She can have frequent exposure to pulmonary irritants, such as fumes, dust, gases, odors and poor ventilation. She can perform simple, routine and repetitive tasks. However, the work environment must be free of fast-paced production requirements, involving only simple work-related decisions and routine workplace changes. Further, the claimant can occasionally interact with the public and coworkers. Lastly, the claimant can have superficial contact with others (defined as no negotiation or confrontation).[15]

Based on an answer to a hypothetical question posed to the vocational expert at the hearing setting forth the residual functional capacity finding quoted above, the ALJ determined that a significant number of jobs existed locally and nationally that Davis could perform.[16] The ALJ, therefore, found Davis not under a disability.[17]

**C.     Issue on judicial review and decision**

Davis asks for reversal of the Commissioner's decision on the ground that it does not have the support of substantial evidence in the administrative record. Specifically, Davis

---

[13] *Id*. at 15-16.

[14] *Id*. 25-26.

[15] *Id.* at 16.

[16] *Id.* at 28.

[17] *Id.*

presents as a single issue for judicial review, whether the ALJ improperly weighed the opinion of the medical expert, Dr. Sai R. Nimmagadda.[18]

For the reasons that follow, I will conclude that the ALJ's finding of no disability is not supported by substantial evidence and, therefore, must be reversed, and the matter remanded.

## Analysis

**A.     Standard of review - Substantial evidence**

The Sixth Circuit in *Buxton v. Halter* reemphasized the standard of review applicable to decisions of the ALJs in disability cases:

> Congress has provided for federal court review of Social Security administrative decisions. 42 U.S.C. § 405(g). However, the scope of review is limited under 42 U.S.C. § 405(g): "The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive...." In other words, on review of the Commissioner's decision that claimant is not totally disabled within the meaning of the Social Security Act, the only issue reviewable by this court is whether the decision is supported by substantial evidence. Substantial evidence is " 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' "
>
> The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.[19]

---

[18] ECF # 20 at 3.

[19] *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001) (citations omitted).

Viewed in the context of a jury trial, all that is necessary to affirm is that reasonable minds could reach different conclusions on the evidence. If such is the case, the Commissioner survives "a directed verdict" and wins.[20] The court may not disturb the Commissioner's findings, even if the preponderance of the evidence favors the claimant.[21]

I will review the findings of the ALJ at issue here consistent with that deferential standard. The relevant evidence from the administrative record will be discussed in detail as part of the following analysis.

**B.     Application of standard**

As noted, this case presents the sole question of whether the ALJ properly assigned little weight to the opinion of Dr. Sai Simmagadda, who testified in this matter as a medical expert.

*1.     The ALJ's decision; Commissioner's position*

The ALJ dealt with the opinion of the ME by first noting that he had engaged Dr. Nimmagadda "[i]n an attempt to clarify the record."[22] He then summarized Dr. Nimmagadda's opinion as follows:

>    *     stated that Ms. Davis "could" equal a listing such as 14.10;

---

[20] *LeMaster v. Sec'y of Health & Human Servs.*, 802 F.2d 839, 840 (6th Cir. 1986); *Tucker v. Comm'r of Soc. Sec.*, No. 3:06cv403, 2008 WL 399573, at *6 (S.D. Ohio Feb. 12, 2008).

[21] *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).

[22] Tr. at 26.

-5-

\*      opined that she "could not sustain a forty-hour workweek," an opinion the ALJ found "unsupported as there has been no definitive diagnosis of Sjorgen's syndrome;"

\*      noted that the ME "could not state with any conviction that [Davis's] activities of daily living, social function and concentration, persistence or pace were more than moderately affected," but rather "kept hedging from 'moderate to marked' back to moderate," before finally "guess[ing] they were moderate;"

\*      observed that the ME's opinion "with respect to sustainability is pure conjecture;" and lastly,

\*      found that the ME's opinion that Davis has a somatoform disorder is questionable because the ME "is not a psychologist."[23]

In the end, the ALJ concluded that he "cannot give much weight to [Dr. Simmigadda's] testimony because he was not firm in his answers and he provided little guidance with respect to whether [Davis] meets or equals a listed impairment."[24]

### 2.     *Claimant's position*

Essentially, Davis contends that the ALJ's reasons for discounting Dr. Simmagadda's testimony are based on an incorrect summary of Dr. Simmagadda's testimony, and an improper characterization of Dr. Simmagadda's views as "hedging" about whether Davis's

---

[23] *Id*. at 27.

[24] *Id*.

functional limitations were marked or moderate.[25] In that regard, she argues that the ALJ failed to fully follow the remand order from the Appeals Council that directed the use of a medical expert in this matter because it was a complicated case.[26]

Specifically, she notes that Dr. Nimmagadda testified that her case was complicated because it involved multiple impairments that effect different physical systems, and that the net result would be days where her overall functioning would be effected to a greater or lesser degree.[27] Davis maintains that Dr. Nimmagadda's conclusion was that even though she did not "quite fit" the listing for Sjorgren's Syndrome, it would nevertheless "be very difficult" for her to work a 40 hour week with limited breaks and limited absences given functional limitations that would shift between marked and moderate depending on their severity on any given day.[28] Viewed in light of the "totality" of Dr. Nimmagadda's testimony, Davis argues that the ALJ improperly described the functional conclusion detailed above as "pure conjecture."[29]

### 3. *Analysis*

Essentially, Davis's argument rests on the assertion that the ALJ misrepresented the true nature of the ME's testimony, and so such misrepresentation cannot be a good reason

---

[25] ECF # 20 at 7.

[26] *Id.*

[27] *Id.* at 136.

[28] ECF # 24 at 2.

[29] ECF # 20 at 7.

for discounting it. A review of that testimony in full establishes that Davis is correct in her contention.

First, I note that although the ALJ stated that the ME was called to "clarify the record," that is correct insofar as it goes but not wholly complete. A more complete statement would have included the fact that this matter was on remand from the Appeals Council, which had sent it back for a new hearing with a specific mandate, among others, that a medical expert be obtained to determine if Davis's impairments meets or equals the severity of a listing.[30] Accordingly, the ME's testimony on the severity of Davis's symptoms as they concern Listing 14.10 - Sjorgen's Syndrome - was not merely a helpful, discretionary convenience, but a requirement imposed on remand.

Listing 14.10 provides two alternative ways to meet the listing. First, under Part A, which essentially addresses the scope of the disease, the listing focuses on whether the disease affects two or more body systems or organs to at least a moderate degree with at least two of the recognized symptoms. Part B, which may be said to be concerned with severity of symptoms, does not require the involvement of multiple body systems, but deals with whether the claimant has two or more of the recognized symptoms and at least one of them is to a marked degree.

---

[30] Tr. at 218; see also *id.* at 10 where the ALJ relates the fact of the remand in the introductory section of the opinion.

In that respect, the ALJ initially focused on Part A of the listing 14.10, which concerns the presence of the syndrome in multiple body systems.[31] To that point, the ME concluded that any Sjorgen's symptoms in Davis do not involve the lungs, the joints or other body systems, except that to a "limited degree [,] it does involve the eyes and the mouth but it's not really [at] moderate level at this point ..."[32] He added that as concerns weight loss and other factors of an autoimmune disease when it "becomes overwhelming for the body to actually fight off," Davis has actually had a weight gain, not a loss.[33] Thus, the ME effectively ruled out any scenario whereby Davis would meet Listing 14.10 under the Part A criteria.

The ALJ then moved to Part B, which focuses of frequency and severity of the symptoms by requiring repeated manifestations of at least two signs or symptoms of Sjorgen's Syndrome, with one of them being at a marked level of severity.[34] Although the ALJ stated that the ME had already "kind of" addressed the first part of this section - *i.e.*, the existence of signs or symptoms of Sjorgen's Syndrome - in his preceding answer, the ME was then asked, as does Part B, if he could speak to how any of Davis's symptoms limit "activities of daily living, limitations in maintaining social functioning and limitations on completing tasks in a timely manner due to deficiencies in concentration, persistence or

---

[31] *Id.*

[32] *Id*.

[33] *Id*.

[34] *Id*.

pace."[35] It is important to stress that the ALJ correctly noted here that such limitations in Part B of Listing 14.10 are an "alternative way to meet that listing ...."[36]

The ME responded by saying that Davis's limitations don't "necessarily rise up meet or equal [the] list for Sjorgen's Syndrome."[37] But, he immediately noted, if one considers all of Davis's other impairments taken together, "it's the other impairments that are not associated with Sjorgen's [that] is creating the inability [*sic*] for activities of daily living and other associated findings here."[38]

Picking up on that last exchange, Davis's counsel asked the ME whether Davis wouldn't be found to have a marked limitation in activities of daily living, in as much as the evidence showed that she has a home health aide, needs oxygen and uses a walker.[39] The ALJ then directly put the question to the ME as to whether, "if you take what you see in the record, what your evaluation [is] of the medical evidence, do you see a limitation in [Davis's] activities of daily living?"[40]

---

[35] *Id.* at 133.

[36] *Id*.

[37] *Id*.

[38] *Id*.

[39] *Id*. at 134.

[40] *Id*.

The ME responded, "Clearly there is, your honor."[41] After explaining that it is difficult in this case to "pigeonhole" "pieces" of a combined diagnosis into different, specific listings, he testified, nevertheless, that "when you take a look at the combination of everything, clearly there's definitely an impact here [on activities of daily living]."[36] To that end, he continued:

> She has shortness of breath. She has chronic cough. She's got the back pain. She needs a walker. She's got the aide. She's got oxygen which may subjectively help her, I don't know if it's objectively needed, but it's there and it is a limitation. So when you take all that into consideration, clearly there is an impact on her ability to function on a daily basis.[37]

The ME then testified that this limitation was "between moderate and marked."[38] Specifically, he noted that in consideration of the testimony and the evidence in the record, the limitation in this area varied "between marked and moderate, marked, moderate to marked...."[39]

Without immediately trying to clarify that statement, the ALJ then moved to the area of maintaining social functioning, asking the ME if he had an opinion "as far as her impairments affect that?"[40]

---

[41] *Id.*

[36] *Id.*

[37] *Id.*

[38] Tr. at 135.

[39] *Id.*

[40] *Id.*

The ME responded:

I would say it is at least a moderate to marked ability on social functioning. Clearly she has a history of depression and chronic illnesses [that] would also affect that, and clearly this has been shown that the multiple impairments she has would affect her daily well being, and it needs to be moderate, if not marked, in this area.[41]

Finally, with respect to the level of her impairments in the area of concentration, persistence and pace, the ME opined:

Clearly with all the impairments she has here I don't feel that she would have the ability for concentration, persistence and pace, and I'm probably going to say that that's going to be more on along the lines of a marked limitation.[42]

Under follow-up questioning from claimant's counsel, the ME expanded on his testimony by stating that "typically," Davis would have only a moderate impairment in the areas of social interaction and daily functioning. But, he also said that "it may be marked on certain days. I can see it when her illnesses are worse on those days that clearly it would be marked, but on average I think it's probably more of a moderate level there."[43]

The ALJ then had this exchange with the ME:

ALJ: I'm sorry, which are you talking about? All of them or are you just talking about one in particular?

ME: I think most of the them, your Honor. I think all of them as far as concentration, persistence and pace for repetitive activity, *et cetera*.[44]

---

[41] *Id.*

[42] *Id.* at 136.

[43] *Id.*

[44] *Id.* at 136-37

That exchange prompted this critical colloquy with the claimant's attorney:

Q:   I'm confused. So, initially you testified that you thought [the impairment as to] concentration was at marked?

A:   Probably on days when she is not doing well clinically it could rise to the level of marked, Counsel. So, I agree there would be good days and bad days with her illnesses, so depending in how she's feeling it would be that [if] she's feeling terrible, it would be marked, and if it's some of the more lesser [*sic*] impact days, she would probably be more moderate.[45]

At this point, the ALJ ended the discussion of Listing 14.10, and shifted the discussion to the listing on COPD.[46]

On review of this testimony, it is plain as an initial matter that it was not a model of probity and clarity. But, that said it does not follow, as the ALJ maintains, that the ME was "hedging" about the level of severity of Davis's symptoms. Rather, it seems that the ME was consistently emphasizing that the level of severity would vary according to whether Davis was having a "good day" or a "bad day."

Further, for that same reason, it is not fully correct to say that the ME "guessed" that all of Davis's impairments were moderate, or that "Dr. Simmagadda could not state with any conviction" that her impairments were more than moderate. As the detailed exposition of the testimony shows, the ME was being careful in trying to describe a situation where symptoms

---

[45] *Id.* at 137.

[46] *Id.*

-13-

associated with one disorder may be aggravated in severity by other impairments,[47] and that the level of such aggravated severity may itself be greater or lesser on certain days.[48]

I also note that the ALJ himself chose to abort the examination of the ME at a critical juncture, when a few additional questions may have fully clarified the testimony. In particular, when the ME testified that Davis's limitation in the area of concentration, persistence and pace would be marked on bad days, while moderate on "lesser impact days," the obvious follow up question would have been to ask if the ME had an opinion as to how many days would fall into each category.[49] Alternatively, Davis herself or her treating physician could have been questioned for additional evidence on this issue.

Further, and much more important, all parties exhibited a fundamental misunderstanding of the categories of "marked" or "moderate," inasmuch as these terms include in themselves an assessment of how the frequency of a symptom affects a claimant's ability to function. Section 14.00(I)(2), applicable to immune system disorders like Sjorgen's, states that the evaluation of symptoms in light of their functional impact includes both "the frequency and duration" of any symptoms, which includes consideration of "periods of exacerbation and remission." Thus, Section 14.00(I)(4) states that to satisfy the "marked" limitation criteria, the ultimate test is to determine the "nature and overall degree of interference with ... functioning."

---

[47] Tr. at 133.

[48] *Id.* at 136-37.

[49] *See, Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009).

Thus, even if the "repeated manifestations" of symptoms, as Part B describes, includes days when the symptoms are severe and days when they are not, the overall result may constitute a "marked" impairment if collectively those symptoms "seriously interfere" with the ability to "function independently, appropriately and effectively."[50] That is the question the ME was supposed to answer, and unfortunately one which still remains unresolved.

It appears that all parties here were, at the very least, imprecise in assuming that "marked" or "moderate" referred solely to severity, while a separate, independent measure or term was needed to assess the effect of "good days and bad days" on function. In fact, as noted, the term "marked" encompasses both an evaluation of the frequency and severity of symptoms as understood in light of the overall effect on function. Much greater clarity would have resulted here if the participant's common understanding of the terms had been corrected, and Dr. Simmigadda had clearly given his opinion as to functional limits in accord with the standard already set out in the regulations.

But that clarification was never made, and the additional questions as to the frequency of good and bad days was never asked, as the ALJ at that point simply "moved on" to consider the listing for COPD.[51]

In the end, I find that the ALJ's reasons for discounting Dr. Simmagadda's opinion are not good ones, as discussed above. Further, the question of whether Davis meets or equals Listing 14.10 - a key point of the remand from the Appeals Council - remains

---

[50] Section 14.00(I)(5).

[51] Tr. at 137.

unanswered, despite testimony from the required ME than came tantalizingly close to resolving this matter, but broke down or remained incomplete as detailed above.

Therefore, for the reasons stated, it is necessary to once again send this matter back for further consideration, with the renewed direction to obtain the testimony of a medical expert on the question of whether Davis meets or equals Listing 14.10.

## Conclusion

For the reasons stated, substantial evidence does not support the finding of the Commissioner that Davis had no disability. Therefore, the denial of Davis's application is reversed and the matter remanded for further proceedings consistent with this opinion.

IT IS SO ORDERED.

Dated: July 31, 2015   s/ William H. Baughman, Jr.
United States Magistrate Judge